STATE OF NORTH CAROLINA v. ALTON DAWES CROUCH

No. 7922SC1150

(Filed 5 August 1980)

1. **Criminal Law § 90– State's impeachment of own witness – prior inconsistent statements – prejudicial error**

    The trial court committed prejudicial error in permitting the district attorney to impeach his own witness by reading from and questioning the witness about portions of a pretrial statement made by the witness to an S.B.I. agent after the court had ruled that such portions of the statement were inadmissible in evidence.

2. **Constitutional Law § 45– refusal to permit defendant to act as co-counsel**

    The trial court did not err in denying defendant's request to serve as co-counsel since a defendant does not have a right to appear both by himself and by counsel.

APPEAL by defendant from *Washington, Judge.* Judgment entered 19 July 1979 in Superior Court, ALEXANDER County. Heard in the Court of Appeals 22 April 1980.

Defendant was charged in a bill of indictment, proper in form, with the offense of murder in the first degree and was convicted of murder in the second degree. Defendant was sentenced to an active term of imprisonment of not less than 18 years nor more than 25 years, from which he appealed.

### STATE'S EVIDENCE

At 7:15 p.m. on 28 December 1978, Rayford and Irene Crouch (husband and wife) were watching television at home when Shuford John Marlow, deceased (Mr. Crouch's first cousin), came to visit them. The three had a few drinks. They went to the store and purchased $12.00 worth of groceries with a $100 bill. Marlow gave Irene the change. They returned to the Crouch home to find defendant (Mr. Crouch's nephew) standing at the door. They entered the trailer and continued to drink intoxicating beverages until Irene sat on defendant's lap and stated, "Shuford [deceased], this is our favorite nephew." Without warning, Marlow jumped up and pushed the table over on defendant, knocking him backward out of his chair onto the floor. A scuffle ensued between deceased and defendant. Rayford and Irene Crouch separated the two. Marlow apologized several times, defendant accepted the apologies, and they shook hands. Marlow went outside, and everyone thought he had gone home. Rayford saw the parking lights on Marlow's car come on at one point. A loud banging was heard at the door a few minutes later, and Marlow was standing there. He said, "Arie one of your [S.O.B.'s] come out here and I'm going to kill you." Rayford Crouch told Marlow that no one was mad at him and that he should come back into the house and spend the night. Marlow said, "By God, I'm going home." Mr. and Mrs. Crouch and defendant talked a few minutes longer. Then, defendant left to go home.

A commotion was heard outside, and Rayford Crouch found both men lying in the yard facing each other. Defendant was cutting Marlow. Rayford Crouch told him to stop and that he

was killing Marlow. Defendant stopped. Rayford Crouch tried to pick up Marlow, but found he had blood all over his arm. He then went into the house. He heard a car crank up and thought defendant was taking Marlow to the hospital. Later, he found Marlow's body in the yard.

### DEFENDANT'S EVIDENCE

Defendant's evidence tended to show that he visited the Crouch home on 28 December, just as the State's evidence tended to show. Events inside the trailer were substantially similar to those described by Rayford and Irene Crouch. Defendant denied saying that there had never been a man whom he could not cut when he took out his knife, and he denied that Marlow had told him to put the knife away. He had shown everyone the knife, because it was a collector's item, and he had just bought it. He carried it with him, because he used it in his work to open cardboard boxes. After he left the trailer, he saw that Marlow was leaning into the passenger side of Marlow's car parked behind his car in the driveway. Defendant asked Marlow to move his car so that he could go home. Marlow came running around the car and swung a hammer at defendant, saying that he was going to kill defendant. Defendant ducked, and the hammer struck a glancing blow off the side of his head. Defendant moved closer to Marlow, trying to avoid further blows, and the two fell to the ground. Marlow continued to try to hit him, and defendant feared for his life. He got out his knife while holding onto Marlow with one hand and began cutting Marlow on the back of his leg. That did no good, so he began cutting Marlow on the back of his head. Marlow continued to hit him. Defendant went home and later returned to Crouch's trailer, found Marlow's body, and called the sheriff.

*Attorney General Edmisten, by Assistant Attorney General Ben G. Irons II, for the State.*

*Edward L. Hedrick, for defendant appellant.*

ERWIN, Judge.

[1] In his brief, defendant brings forward 38 assignments of error based on 135 exceptions taken during his trial. Defendant contends, *inter alia,* that the trial court committed error in allowing the district attorney to repeatedly question, argue with, and belittle his own witnesses concerning pretrial statements given to agents of the State Bureau of Investigation and in allowing the district attorney to ask leading questions of his own witness, portions of which questions were read verbatim upon excluded portions of the pretrial statements. We find prejudicial error, the judgment entered is vacated, and the defendant is awarded a new trial.

In *State v. Anderson,* 283 N.C. 218, 224-25, 195 S.E. 2d 561, 565-66 (1973), Justice Sharp (later Chief Justice) stated the rule for the Supreme Court relating to a party impeaching his own witness as follows:

"Until changed by statute applicable to civil cases (G.S. 1A-1, Rule 43(b) (1969)), it was established law in this State that a party could not impeach is own witness in either a civil or a criminal case. 1 Stansbury, *North Carolina Evidence* § 40 (Brandis rev. 1973). *See also* McCormick, *Evidence* § 38 (Cleary Ed., 2d, ed. 1972); 3A Wigmore, *Evidence* §§ 896-905 (Chadbourn rev. 1970). This rule, unchanged as to criminal cases, still precludes the solicitor from discrediting a State's witness by evidence that his general character is bad or that the witness had made prior statements inconsistent with or contradictory of his testimony. However, the trial judge has the discretion to permit the solicitor to cross-examine either a hostile or an unwilling witness for the purpose of refreshing his recollection and enabling him to testify correctly. 'In so doing, the trial judge may permit the party to call the attention of the witness directly to statements made by the witness on other occasions. *S. v. Noland,* [204 N.C. 329, 168 S.E. 413 (1933)]; *S. v. Taylor,* [88 N.C. 694 (1883)]. But the trial judge offends the rule that a witness may not be impeached by the party calling him and so commits error if he allows a party to cross-examine his own witness solely for the purpose of proving him to be unworthy of belief.' *State v. Tilley,* 239 N.C. 245, 251, 79 S.E. 2d 473, 477-78 (1954)."

In *State v. Smith*, 289 N.C. 143, 157, 221 S.E. 2d 247, 255-56 (1976), Justice Huskins stated for the Supreme Court:

"During the examination of James Thomas, the district attorney questioned him with reference to a paper writing marked State's Exhibit 10 which purportedly was a statement made by Thomas to a police officer in November 1973. This statement apparently consisted of responses to the identical questions which were being asked at trial regarding the involvement of defendants in the crimes charged in this case. Defendants objected to the interrogation of Thomas concerning his previous written statement and, with the jury absent, argued that such examination was tantamount to the State's impeachment of its own witness. In overruling the objections the court replied that the statement previously made by Thomas was 'no more impeaching than the leading questions that he has been permitted to ask.' That is precisely the point defendants now urge, and we think the point is well taken.

The district attorney's 'leading questions' were calculated not only to impeach his own witness but also to prove the contents and the truth of the prior inconsistent testimony of the witness at the first trial. The obvious effect of these questions was to demonstrate to the jury that a written record existed which corroborated verbatim the 'testimony' contained in the district attorney's questions. The anti-impeachment rule makes Exhibit 10 imcompetent as evidence, and the district attorney's questions which indirectly but unmistakably placed it before the jury were prejudicial. Such interrogation of the witness Thomas violated the 'rule of law which forbids a prosecuting attorney to place before the jury by argument, insinuating questions, or other means, incompetent and prejudicial matters not legally admissible in evidence.' *State v. Phillips*, 240 N.C. 516, 82 S.E. 2d 762 (1954); *accord, State v. Anderson, supra*."

Rayford Crouch was interviewed by Special Agent Lester of the SBI on 29 December 1978. A written statement was taken by the agent. Judge Washington ruled that the

following portion of the 29 December 1978 statement of Rayford Crouch was excluded from being introduced into evidence at the trial of defendant:

*"December 29, 1978 Interview of Rayford W. Crouch:*

According to Rayford Crouch, after the first affray inside the trailer, and after Shuford Marlow had returned and stated, 'If any one of you sons-of-bitches come out of that place, I'li kill you.' Alton stated that he was, 'Not scared of the son-of-a-bitch and go up and went out the door.'

The witness stated that when Alton Crouch returned the next morning to find the body of Shuford Marlow, the defendant said, 'Let's take him and throw him in the river.' The witness stated that he told Alton, 'Hell no, I'm not having nothing to do with that.'"

On direct examination of Rayford Crouch by Mr. Zimmerman, the following questions were propounded:

"Q. Now, again, you talked to Special Agent Lester and gave him a statement, didn't you?

A. Yes, sir.

Q. And you looked at what I showed you just a minute ago. I ask you to look at this and refresh your recollection about this, also. Look at that line I have underlined right there where my thumb is. Does that refresh your recollection now as to what you told him?

A. I told him that.

Q. What was that you told him?

MR. HEDRICK: OBJECTION.

COURT: OVERRULED.

EXCEPTION NO. 10

A. I told him that he said, 'Let's throw him in the river.'

Q. Who said that?

A. Alton, but just like I said, I drunk so much liquor and everything until I have these hallucinations and dreams, and I'll not get on this stand and swear that that is the Gospel truth.

Q. But you ain't going to swear you didn't say it, either, are you?

MR. HEDRICK: OBJECTION.

COURT: SUSTAINED. You can't cross examine your own witness.

MR. ZIMMERMAN: I understand, if Your Honor please.

Q. Now, you see that there, Rayford?

A. Yes.

Q. Does that refresh your recollection — what did you say then?

MR. HEDRICK: OBJECTION.

COURT: OVERRULED.

EXCEPTION NO. 11

A. I don't think he said that.

Q. What did he say, though?

A. He said — said, 'I'm a going home.'

Q. What did you tell the agent that he said after you refreshed your recollection now?

MR. HEDRICK: OBJECTION.

COURT: OVERRULED.

MR. HEDRICK: I'd like to be heard, if Your Honor please.

(Conference at the bench with the court and Mr. Hedrick and Mr. Zimmerman.)

COURT: The objection is sustained to that question.

MR. ZIMMERMAN: Cross examine.

(To the foregoing which, despite the court's rulings, amounted to an impeachment of his own witness by the district attorney, the defendant respectfully excepts.)

EXCEPTION NO. 12"

On redirect examination of Rayford Crouch, Mr. Zimmerman propounded:

"Q. All right. Now, what was that he asked you to put in that there — is that what is up here?

MR. HEDRICK: OBJECTION.

COURT: OVERRULED.

Q. Is that what he told you to say — is that one of the things Mr. Lester told you to say?

A. Well, I don't recall.

Q. That Alton said he wasn't scared of the son-of-a-bitch and went out the door?

(The foregoing questions were asked while the district attorney was pointing to a paper in his hand and holding the paper in the face of the witness.)

MR. HEDRICK: Objection to his reading that to the jury, your Honor. (Referring to the district attorney's reading from the SBI report to the witness.)

COURT: Members of the jury, the question of counsel is not evidence of itself. The witness testifies from the witness stand. Next question?

Q. What did this man right here tell you to put in there that wasn't the truth? (Referring to the statement again.)

A. Well, I don't know just offhand. He just scared me, and I had been drinking so much that I would have told him anything to get out of there. I ain't going to swear that he said those words now.

Q. What words?

A. That he said he wasn't scared of him.

MR. HEDRICK: OBJECTION.

MR. ZIMMERMAN: He has a right to answer now.

(Comment directed to defense counsel)

(To the court's failure to rule upon defense counsel's objection and to the court's allowing the questioning to proceed, the defendant respectfully excepts.)

EXCEPTION NO. 14

A. I'm not going to say he said, 'I'm not scared of the son-of-a-bitch,' because he said three or four times he was going home; but whether he said that, I wouldn't swear to that.

Q. You say Alton said that and you can't swear to that, is that right?

A. That's right.

Q. Now, you said, (Alton said), 'Let's take him and throw him in the river.' You are saying Mr. Lester told you that — to tell that, too?

A. No, sir, I believe I dreamed that, because I have a lot of hallucinations over drinking whiskey.

Q. Did you dream him out there, this man, cutting that old man out in the yard there?

Mr. HEDRICK: OBJECTION.

COURT: OVERRULED.

EXCEPTION NO. 15

A. No, sir.

Q. Was that dreaming?

A. No, but I hadn't been asleep yet then. I'd been asleep whenever he questioned me."

The State contends that the record does not show prejudicial error and relies on *State v. Peplinski,* 290 N.C. 236, 225 S.E. 2d 568 (1976), *cert. denied,* 429 U.S. 932, 50 L.Ed. 2d 301, 97 S.Ct. 338 (1976). The distinction between *Peplinski* and the case *sub judice* lies in the fact that Judge Washington had ruled that the portion of the statement complained of would not be admitted into evidence; but nevertheless, the district attorney continued to read and to cross-examine his witness about the excluded statement. We are compelled to find prejudicial error in this assignment of error.

[2] The trial court did not err in denying defendant's request to serve as co-counsel. A party has the right to appear in *propria persona* or by counsel, but the right is alternative, and one has no right to appear both by himself and by counsel. *State v. Phillip,* 261 N.C. 263, 134 S.E. 2d 386 (1964), *cert. denied,* 377 U.S. 1003, 12 L.Ed. 2d 1052, 84 S.Ct. 1939 (1964), *reh. denied,* 379 U.S. 874, 13 L.Ed. 2 d 83, 85 S.Ct. 28 (1964).

We do not consider the other assignments of error, in that they may not occur at retrial of this defendant.

Defendant is awarded a

New trial.

Judges HEDRICK and ARNOLD concur.